## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**Leave to File
granted on June 2, 2017**

| | | |
|---|---|---|
| MICHAEL S. SINGER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: 1:17-CV-10071-WGY |
| | ) | **Amicus Brief** |
| v. | ) | |
| | ) | |
| CITY OF NEWTON, | ) | |
| | ) | |
| Defendant. | ) | |

## *AMICI CURIAE* BRIEF FOR
## THE CONSUMER TECHNOLOGY ASSOCIATION AND THE
## ASSOCIATION FOR UNMANNED VEHICLE SYSTEMS INTERNATIONAL

*/s/ Jeffrey J. Ellis*
Jeffrey Ellis, Esq.
Daniel Correll, Esq.
Troy Shuman, Esq. (BBO# 693405)
Clyde & Co US LLP
The Chrysler Building
405 Lexington Avenue, 16th Floor
New York, NY 10174
Tel: 212-710-3900
Fax: 212-710-3950
E-mail: Jeff.Ellis@clydeco.us

*Attorneys for The Consumer Technology
Association and The Association for Unmanned
Vehicle Systems International*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................ ii

IDENTITIES AND INTERESTS OF AMICI CURIAE .................................................. 1

SUMMARY OF POSITION............................................................................................ 3

ARGUMENT ................................................................................................................... 7

I.    THE FEDERAL GOVERNMENT'S RIGHT TO UNIFORMLY REGULATE
      NAVIGATION IS A FUNDAMENTAL PRECEPT
      OF OUR JURISPRUDENCE ................................................................................ 7

      A. Federal Control Over the Navigable Airspace is Derived from
         Case Law Addressing Federal Regulation of the Navigable
         Waters. ........................................................................................................... 8

      B. The Need for Uniformity and the Nature of Aviation Are the
         Building Blocks of Aviation Preemption Jurisprudence ............................ 12

II.   THE CURRENT REGULATORY REGIME FOR NAVIGABLE
      AIRSPACE IS PREDICATED UPON A UNIFORM AND
      EXCLUSIVELY FEDERAL SYSTEM ............................................................. 14

III.  FEDERAL CONTROL OF THE NAVIGABLE AIRSPACE PREEMPTS
      ALL STATE AND LOCAL ATTEMPTS TO REGULATE FLIGHT
      OPERATIONS, INCLUDING THOSE CONDUCTED BELOW 400
      FEET .................................................................................................................. 17

IV.   CONSISTENT WITH ITS LONGSTANDING MANDATE TO SAFELY
      AND EFFICIENTLY DEVELOP THE NATIONAL AIRSPACE,
      CONGRESS HAS DIRECTED THE FAA TO INTEGRATE
      UNMANNED AIRCRAFT INTO THE NATIONAL AIRSPACE ..................... 21

V.    THE LONG HISTORY OF AN EXCLUSIVELY FEDERAL
      REGULATORY SCHEME COUPLED WITH THE ABSENCE OF ANY
      VALID STATE OR LOCAL REGULATION WARRANT A FINDING
      THAT THE NEWTON ORDINANCE IS PREEMPTED ................................... 25

CONCLUSION.............................................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

*Cases*

*American Airlines, Inc. v. Hempstead,*
  398 F.2d 369 (2d Cir. 1968)..............................................................................20

*Buckman Co. v. Plaintiffs' Legal Comm.,*
  531 U.S. 341 (2001)..........................................................................................28

*Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp,*
  333 U.S. 103 (1948)..........................................................................................13

*City of Burbank v. Lockheed Air Terminal, Inc.,*
  411 U.S. 624 (1973)..................................................................................... *passim*

*Cooley v. Board of Wardens,*
  53 U.S. 299 (1851)..............................................................................................9

*French v. Pan Am Express, Inc.,*
  869 F.2d 1 (1st Cir. 1989).........................................................................6, 19, 28

*Gibbons v Ogden,*
  22 U.S. 1 (1824)........................................................................................ *passim*

*Huerta v. Haughwout,*
  No. 3:16-CV-358 (JAM), 2016 WL 3919799
  (D. Conn. July 18, 2016)....................................................................................4

*Huerta v. Pirker,*
  NTSB Order No. EA-5730, 2014 WL 8095629 (NTSB 2014) ................................4

*Montalvo v. Spirit Airlines,*
  508 F.3d 464 (9th Cir. 2007) ............................................................................28

*Nw. Airlines, Inc. v. Minn.,*
  322 U.S. 292 (1944)..................................................................................4, 11-12

*Ophir v. City of Boston,*
  647 F. Supp. 2d 86 (D. Mass. 2009) ..............................................................26-27

*Opinion of the Justices,* 359 Mass. 778,
  271 N.E.2d 354, 356–57 (1971)....................................................................18-20

*People v. Santoriello,*
  183 Misc. 2d 54, 702 N.Y.S.2d 539 (Crim. Ct. 1999)...........................................22

*United Parcel Service, Inc. v. Florez-Garlaza,*
    318 F.3d 323 (1st Cir. 2003) ..........................................................................28

*United States v. Causby,*
    328 U.S. 256 (1946) ................................................................ 12-13, 28

*United States v. Locke,*
    529 U.S. 89 (2000) .................................................................... 27-28

*US Airways, Inc. v. O'Donnell,*
    627 F.3d 1318 (10th Cir. 2010) ........................................................28

**Statutes, Rules, and Regulations**

49 U.S.C. § 176(a) ....................................................................................14

49 USC §40101, note ...................................................................... 1, 4-5, 22

49 U.S.C. §40102(a)(6) ..............................................................4, 14-15, 17

49 U.S.C. § 40103 .....................................................................................21

49 U.S.C. 40103(a) ...................................................................................14

49 U.S.C. § 40103(b) ..................................................................................4

PL 112-95 § 331 .....................................................................................4, 22

PL 112-95 § 332 .....................................................................................5, 22

Air Commerce Act of 1926, 44 Stat. 568,
    49 U.S.C. § 171, et seq. .............................................................4, 10, 14

Civil Aeronautics Act of 1938, 52 Stat. 973,
    49 U.S.C. § 401, et seq. ...............................................................14

14 CFR Part 31 ..........................................................................................21

14 CFR Part 43 ..........................................................................................21

14 CFR Part 91 ..........................................................................................21

**Other Authorities**

68th Cong., 2d Sess. 54-55 (1924) (statement of William
    MacCracken Jr., Chairman, ABA Commission on the
    Law of Aeronautics) ........................................................................10

Civil Aeronautics: Legislative History of the Air
    Commerce Act of 1926 ............................................................................................10

H.R. Rep. No. 85-2360 ...............................................................................................15

H.R. Rep. No. 85-2360 (1958), *reprinted in*
    1958 U.S.C.C.A.N. 3741 ........................................................................................14

S. 3880, 85th Cong., 2d Sess. .....................................................................................15

S. Rep. No. 85-1811, at 5 (1958) ...............................................................................20

http://history.nasa.gov/SP-4103/ch3.htm
    (last visited on May 17, 2017) .............................................................................10

https://www.faa.gov/uas/resources/uas_regulations_policy/
    media/uas_fact_sheet_final.pdf ........................................................................5, 19

http://knowbeforeyoufly.org/
(last visited on May 17, 2017) .....................................................................................1

https://www.faa.gov/aircraft/air_cert/design_approvals/balloons/balloons_regs/
 (last visited on May 30, 2017). ...............................................................................21

FAA's Glider Flying Handbook, available at
https://www.faa.gov/regulations_policies/handbooks_manuals/aircraft/glider_handbook/
(last visited on May 30, 2017). ..................................................................................21

## IDENTITIES AND INTERESTS OF AMICI CURIAE

The Consumer Technology Association ("CTA") is the preeminent trade association for the U.S. consumer technology industry. CTA's more than 2,200 corporate members, 80% of which are small businesses and startups, contribute in excess of $125 billion to the U.S. economy.

As a member of the Federal Aviation Administration's ("FAA") UAS[1] Registration Task Force and Micro UAS Aviation Rulemaking Committee, CTA and its members have worked with the FAA to develop drone operation and registration regulations consistent with Congress' objective of safely and securely integrating drone technology into our national airspace.

CTA believes that we are at a crucial time to develop the proper regulatory framework for drone technology. It believes that like manned aircraft, unmanned aircraft require uniform laws and regulations in order to avoid the potential for operator confusion and a patchwork regulatory scheme that is difficult to understand, apply and enforce. For that reason, it works with local and state governments to avoid the creation of conflicting laws and regulatory initiatives while also vigorously supporting the FAA's "Know Before You Fly" consumer safety campaign.[2]

The Association for Unmanned Vehicle Systems International ("AUVSI") is the world's largest nonprofit organization devoted exclusively to advancing the unmanned systems and robotics community, including unmanned aircraft systems.  Serving more than 7,500 members from government organizations, industry and academia, AUVSI is committed to fostering, developing, and promoting unmanned systems and robotics technologies. AUVSI members

---

[1] "UAS" is defined as an unmanned aircraft system which includes communication links and the components that control the unmanned aircraft. *See* Section 331(8) and (9) of the FAA Modernization and Reform Act of 2012, PL 112-95; codified at 49 USC §40101, note. As used in the brief, the term "unmanned aircraft" includes UAS.

[2] *See* http://knowbeforeyoufly.org/ (last visited on May 17, 2017).

1

support the defense, civil and commercial sectors.   AUVSI organizes and hosts an annual trade show, XPONENTIAL, that serves as a gathering place for unmanned systems developers, manufacturers, and operators.

AUVSI's President and CEO, Brian Wynne, is a member of the FAA's Drone Advisory Committee, the federal advisory committee created by the FAA to help provide input into the safe integration of UAS into the national airspace.   He also participated in the FAA's UAS Registration Task Force and Micro UAS Aviation Rulemaking Committee, and is a member of the FAA's Unmanned Aircraft Safety Team, which is comprised of stakeholders from government and the aviation industry that gather and analyze data to enhance UAS safety and operations.

AUVSI believes that the UAS industry has tremendous potential as a transformative technology. According to an AUVSI study, during the first 10 years after UAS are integrated into the national airspace, more than 100,000 jobs are forecasted to be created in the United States along with over $82 billion in economic impact.

AUVSI has thus advocated both at the federal and state level for common-sense regulations on unmanned aircraft that will allow the industry to grow while ensuring safety of operations.   AUVSI has consistently stated its agreement with the FAA that one of the reasons the United States boasts an air safety record that is the envy of the world is because of the uniformity and predictability of its aviation rules.   This uniformity must be preserved if UAS are to be successfully and safely integrated into the air system; inconsistent local regulation of unmanned aircraft threatens not only the development of the industry but also the safety of those both in the air and on the ground.

### SUMMARY OF POSITION

The preemption issue before this Court pertains to a wondrous new technology which has the potential to change for the better myriad aspects of everyday life and commerce. Local, State and federal governments all are aware of this potential and all have legitimate concerns about how to safely and efficiently monitor its development and use.

CTA and AUVSI agree with the City of Newton ("Newton") that State and local governments have police powers, which can be used to regulate matters impacting the health, safety and the privacy of its citizens. They also believe that laws enacted to enforce these rights can be used to sanction the operators of unmanned aircraft systems. But, such regulation must be undertaken in a technology-neutral manner.

The issue before the Court, however, is not the *existence* of such powers. Rather, like most of the cases dealing with preemption, the issue at bar pertains to the *exercise* of these powers in an area of the law where the federal government also possesses the power to regulate.

Both Congress and the Supreme Court have long recognized that the federal government *exclusively* regulates the flight and navigation of aircraft in the national airspace. As Plaintiff correctly points out, many Supreme Court cases have recognized that the authority for the exercise of this federal power can be found in the Commerce Clause. Additionally, other Supreme Court cases hold that the exercise of this power is warranted by the very *nature* of aviation.

This is because from its inception, aviation law has developed as an outgrowth of the legal authority vesting the federal government with primary control over the navigable waters of the United States. In that regard, the Supreme Court has held that "air as an element to navigate

is even more inevitably federalized . . . than is navigable water"[3] and that "federal control is *intensive* and *exclusive*" in this area.[4]

In 49 U.S.C. §40102(a)(6), the Federal Aviation Act of 1958 ("1958 Act")[5] defines "aircraft" expansively as "any contrivance invented, used, or designed to navigate, or fly in, the air." The FAA has taken the position in two different cases that unmanned aircraft meet the 1958 Act's definition of aircraft and, both the NTSB and a federal district court have agreed.[6] Moreover, when Congress enacted the FAA Modernization and Reform Act of 2012, PL 112-95. ("2012 FMRA"),[7] it defined "unmanned aircraft" as "aircraft."[8] Although unmanned aircraft technology still is developing, Congress has recognized that this newer type of aircraft must be integrated into the exclusively federal regulatory structure that has controlled aviation from shortly after its inception.

In recognition of the need for a single, national system of control, Congress long ago established an exclusively federal structure for the development and use of the navigable airspace, the identification of aircraft and the protection of persons and property on the ground. That structure has existed since Congress first enacted the Air Commerce Act of 1926.[9] Since passage of the 1958 Act, Congress has charged the FAA with implementing this objective[10] and as of 2012, specifically charged the FAA with integrating unmanned aircraft into this regulatory

---

[3] *See Nw. Airlines, Inc. v. Minn.*, 322 U.S. 292, 302, 303 (1944), (Jackson J., concurring).
[4] *Id.*
[5] 49 U.S.C. §§40101 *et seq.*
[6] *See Huerta v. Pirker*, NTSB Order No. EA-5730, 2014 WL 8095629 (NTSB 2014) and *Huerta v. Haughwout*, No. 3:16-CV-358 (JAM), 2016 WL 3919799, at *3 (D. Conn. July 18, 2016).
[7] Codified at 49 USC §40101, note.
[8] *See* §§331(8) and (9) of 2012 FMRA.
[9] 44 Stat. 568, 49 U.S.C. § 171, et seq.
[10] 49 U.S.C. § 40103(b).

structure.[11] Not surprisingly, no State or locality has established a comprehensive regulatory structure to control the flight of either manned or unmanned aircraft.

As this Court has recognized previously, in areas of the law where there has been a history of significant federal presence and an absence of State or local regulation, there is no presumption against preemption. Indeed, the Supreme Court has held that in areas of the law subject to a longstanding federal regulatory structure and need for uniformity, the party arguing against preemption must demonstrate that the claimed exercise of police power is consistent with federal regulation and objectives. Newton's brief does not provide any legal authority to support such a showing.

Similarly, Newton's brief provides no legal authority for now allowing State and local governments to regulate the flight of any aircraft, manned or unmanned. Instead, Newton erroneously argues that statements made by the FAA authorize the ordinance at issue. However, the FAA has never authorized any State or local government to regulate the flight of unmanned aircraft. On the contrary, the FAA has specifically stated, "Substantial air safety issues are raised when state or local governments attempt to regulate the operation or flight of aircraft," and that "[a] navigable airspace free from inconsistent state and local restrictions is essential to the maintenance of a safe and sound air transportation system."[12]   Indeed, because this is a field occupied by the federal government, "even complimentary state regulation is impermissible."[13]

---

[11] Section 332 of the 2012 FMRA, "INTEGRATION OF CIVIL UNMANNED AIRCRAFT SYSTEMS INTO NATIONAL AIRSPACE SYSTEM."

[12] *See* Newton Exhibit 14, p.2 ("*State and Local Regulation of Unmanned Aircraft Systems*") FAA Office of the Chief Counsel; *see also,* https://www.faa.gov/uas/resources/uas_regulations_policy/ media/uas_fact_sheet_final.pdf (last visited on May 17, 2017).

[13] *See* Newton Exhibit 14, p.2.

It is for that reason that the FAA's regulatory guidance information specifically excludes "operational restrictions on flight altitude" from its list of examples of restrictions within state and local power, and urges that any State or local government considering any should first consult with the FAA.[14] The FAA also explains that "a '*patchwork quilt*' of differing restrictions could severely limit the flexibility of FAA in controlling the airspace and flight patterns, and ensuring safety and an efficient air traffic flow."[15] The FAA cites numerous legal authorities to support these statements including citation to the First Circuit's decision in *French v. Pan Am Express, Inc.*, 869 F.2d 1 (1st Cir. 1989), where reference is made to the "*patchwork quilt*" analogy.

Newton's brief makes no mention of the foregoing case law and its submission indicates that it has not availed itself of the FAA's guidance and/or consulted with it regarding the issues which it now attempts to regulate. While CTA and AUVSI believe that applicable law clearly preempts the Newton ordinance on both conflict and field preemption grounds, consultation with the FAA may well yield a sensible solution to Newton's concerns without infringing on the federal government's right to exclusively regulate the navigable airspace and without imperiling the need for uniformity that is the foundation of this system.

Following such a process would not only be consistent with the current regulatory scheme but also would allow any issues of conflict to be more fully developed. At this point, however, Newton's ordinance and attempt to regulate unmanned aircraft are clearly contrary to the exclusively federal regulatory framework recognized by the Supreme Court, First Circuit and even the Massachusetts Supreme Judicial Court. Therefore, and in light of all the foregoing, CTA and AUVSI believe that the Newton ordinance should be held to be preempted.

---

[14] *Id.* at 3.
[15] *Id.* at 2 (emphasis added).

# ARGUMENT

## I.
## THE FEDERAL GOVERNMENT'S RIGHT TO UNIFORMLY REGULATE NAVIGATION IS A FUNDAMENTAL PRECEPT OF OUR JURISPRUDENCE.

The briefs of the parties adequately set forth the relevant provisions of the Newton ordinance that are the basis for Plaintiff's preemption claim. As noted therein, those provisions impose clear and obvious restrictions on the flight of unmanned aircraft. In essence, Newton argues that federal law allows, and the FAA authorizes, Newton to regulate the use and navigation of all unmanned aircraft operations below 400 feet altitude.

Contrary to the position which it now espouses, the discovery materials and information provided in the record indicate that during the deliberation period regarding the enactment of this ordinance, Newton's attorneys questioned the validity of such regulation on preemption grounds.[16] Nonetheless, they now argue that Newton's right to legislate in areas related to health, safety and privacy provides the legal authority for allowing this type of regulation. In so doing, they generally ignore the case law cited by the Plaintiff to establish that Newton's exercise of its police power in this area is preempted by a long established federal regulatory scheme and specific conflict with provisions of federal law. As also explained herein, Newton completely misreads the FAA's guidance in this area.

As an initial matter, it is relevant to consider the legal and regulatory framework for resolving the preemption issue before the Court. In that regard, CTA and AUVSI agree with Plaintiff that Supreme Court precedent, acts of Congress and a comprehensive federal regulatory scheme regarding flight operations all establish that federal control over all forms of aircraft flight is exclusive and preempts any attempt by State or local governments to infringe upon

---

[16] *See* Docket 40-4, at p.4.

same. Although much of the cited case law was issued long before the recent advancements in unmanned flight, it is nonetheless relevant for this Court to consider, especially given that much of that case law addresses whether an existing preemption scheme extends to the integration of new technology in that field.

Just as this Court is now considering the spheres of governmental regulation applicable to unmanned flight, so too did other Courts first consider the regulation of manned flight. The legal principles that they relied upon to do so were derived from earlier cases addressing other forms of new technology and the legal principles applicable to other forms of navigation. This body of case law remains relevant to the analysis of the issues now before the Court.

### A. Federal Control Over the Navigable Airspace is Derived from Case Law Addressing Federal Regulation of the Navigable Waters.

The seminal case involving exclusive federal power over interstate commerce, *Gibbons v Ogden*, 22 U.S. 1(1824), also arose out a dispute regarding New York's right to regulate recently developed technology.   As all students of constitutional law learn, New York claimed the right to exclusively license steamships using New York's navigable waters. Gibbons, through his attorney, Daniel Webster, argued that the New York law should be held to be invalid.  Although the Supreme Court's decision never uses the word "preemption," it represents a significant decision in our jurisprudence as to the allocation of State and federal regulatory authority.

The Supreme Court's holding in *Gibbons* invalidated New York's authority to regulate the new steamship trade and control the licensing of operators. Justice Marshall famously held that the federal government's "power of regulating commerce extends to the regulation of navigation." 22 U.S. at 191.  In reaching that conclusion, he not only considered the origins and meaning of the Commerce Clause, but also the practical impact of allowing State and local governments to regulate navigation.

The Court found that there are some subjects which by their nature require exclusive federal regulation, specifically including navigation.  In that regard, Chief Justice Marshall stated, "The power over commerce, including *navigation,* was one of the *primary objects for which the people of America adopted their government,* and must have been contemplated in forming it." 22 U.S. at 190 (emphasis added). In so holding, the Court determined that the regulation of commerce and navigation extends to all types of vessels using the navigable waters of this nation regardless of whether a vessel is powered by wind and sail or a steam engine.

The holding in *Gibbons v Ogden* rationally extended the existing body of law regulating use of the navigable waters to a new technology that was not in existence at the time that the existing regulatory framework was established. The Court's holding was based on the "nature" of the new technology being similar in use to the older technology and the regulatory framework for the latter being suitable for both. A few decades later, the Supreme Court built upon that reasoning when deciding a dispute regarding whether federal or State law regulated the piloting of vessels in the Philadelphia harbor.

*Cooley v. Board of Wardens,* 53 U.S. 299 (1851) echoes the holding of *Gibbons* and specifically provides that federal power must extend to matters that "are in their *nature* national, or admit only of one *uniform* system or plan of regulation." (emphasis added) 53 U.S. at 319. The Supreme Court explained that federal authority over navigation necessarily includes the power to establish the rules for navigation that are applicable to all persons and vessels.  In that regard, the Court stated,

> The power to regulate navigation is the power to prescribe rules in conformity with which navigation must be carried on. **It extends to the persons who conduct it, as well as to the instruments used.**

*Cooley, supra,* 53 U.S. at 316 (emphasis added).

The first federal laws to regulate aviation were enacted less than a generation after the Wright Brothers' first flight. Shortly before the armistice ending World War I, the general manager of the Manufacturers Aircraft Association wrote to the National Advisory Committee for Aeronautics suggesting federal legislation to regulate civil and commercial aviation.[17] Much study was given to how to go about doing so and in 1926, Congress enacted the Air Commerce Act establishing a federal regulatory regime over air traffic and commerce.[18]

Congressional hearings leading to the passage of the 1926 Act demonstrate that the rationale for its enactment was recognition that the nature of the subject matter required exclusively federal regulation. In that regard, a key witness who testified at these early hearings was William MacCracken Jr., the chairman of the American Bar Association Committee on the Law of Aeronautics.

MacCracken's committee had assisted Congress in drafting the bill and "solving the legal problems that have been presented."[19] When he explained the legal framework of the proposed legislation, MacCracken stated: "There were two things that were of controlling importance. One was that there should be *exclusive* regulatory power in the Commissioner to the end that there might be *uniformity* throughout the States."[20]

The principles of exclusivity and uniformity that were used as the cornerstone for Congress's first aviation laws continue to be used today. That is because the nature of aviation requires that it must be uniformly regulated. As Congress recognized in 1926, the only way to

---

[17] *See* http://history.nasa.gov/SP-4103/ch3.htm (last visited on May 17, 2017).

[18] Air Commerce Act of 1926, 44 Stat. 568, 49 U.S.C. § 171, et seq.

[19] *Bureau of Civil Air Navigation in the Department of Commerce: Hearings on H.R. 10522 Before the H. Comm. on Interstate and Foreign Commerce*, 68th Cong., 2d Sess. 54-55 (1924) (statement of William MacCracken Jr., Chairman, ABA Commission on the Law of Aeronautics) [hereinafter *Hearings on H.R. 10522*]; *see also* Civil Aeronautics: Legislative History of the Air Commerce Act of 1926, at 30 (1928).

[20] *Hearings on H.R. 10522, supra* note 19, at 55 (emphasis added).

do so is with an exclusively federal regulatory structure. The early Supreme Court cases considering this issue unequivocally agreed and cited to its prior maritime holdings to support this conclusion.

Plaintiff correctly relies upon the widely-cited Supreme Court decision of *Nw. Airlines, Inc. v. Minn.*, 322 U.S. 292 (1944), which addressed the preemption of a state's personal property tax law as applied to commercial aircraft. Like *Gibbons*, the *Nw. Airlines* case dealt with a developing technology, a State's exercise of its police powers and the federal government's regulatory authority over navigation. The *Nw. Airlines* case cites to and builds upon the holding in *Gibbons* even though that case had been decided more than a century earlier.

Justice Jackson's concurring opinion in *Nw. Airlines* is oft cited for his articulate description of the comprehensive role that the federal government plays with respect to regulating aviation. His words aptly describe the reason why the "nature" of aviation, like the nature of the navigable waters, requires uniform federal regulation:

> We are at a stage in development of air commerce roughly comparable to that of steamship navigation in 1824 when *Gibbons v. Ogden*, 9 Wheat. 1, 6 L.Ed. 23, came before this Court. Any authorization of local burdens on our national air commerce will lead to their multiplication in this country. Moreover, such an example is not likely to be neglected by other revenue-needy nations as international air transport expands.

> Aviation has added a new dimension to travel and to our ideas. The ancient idea that landlordism and sovereignty extend from the center of the world to the periphery of the universe has been modified. Today the landowner no more possesses a vertical control of all the air above him than a shore owner possesses horizontal control of all the sea before him. The air is too precious as an open highway to permit it to be 'owned' to the exclusion or embarrassment of air navigation by surface landlords who could put it to little real use.

> Students of our legal evolution know how this Court interpreted the commerce clause of the Constitution to lift navigable waters of the United States out of local controls and into the domain of federal control. *Gibbons v. Ogden*, 9 Wheat. 1, 6 L.Ed. 23, to *United States v. Appalachian Electric Power Co.*, 311 U.S. 377, 61 S. Ct. 291, 85 L.Ed. 243. **Air as an element in which to navigate is even more**

> **inevitably federalized by the commerce clause than is navigable water.** Local
> exactions and barriers to free transit in the air would neutralize its indifference to
> space and its conquest of time.
>
> **Congress has recognized the national responsibility for regulating air
> commerce. Federal control is *intensive* and *exclusive*.** Planes do not wander
> about in the sky like vagrant clouds. They move only by federal permission,
> subject to federal inspection, in the hands of federally certified personnel and
> under an intricate system of federal commands. The moment a ship taxies onto a
> runway it is caught up in an elaborate and detailed system of controls.

*Id.* at 302, 303 (Jackson, J., concurring) (emphasis added).

Justice Jackson's analysis as well as his recognition of the exclusively federal regulatory

structure for a still-developing technology established the foundation for all of our aviation

preemption jurisprudence.

**B. The Need for Uniformity and the Nature of Aviation Are the Building Blocks of Aviation Preemption Jurisprudence.**

In 1946, the Supreme Court again cited to the unique nature of aviation to explain why

uniform federal regulation was required. *United States v. Causby*, 328 U.S. 256 (1946)

addressed a claim brought by a resident living adjacent to an airfield who complained that the

aircraft using the airport had no right to violate the airspace above his property or disturb his use

and enjoyment of his property. Plaintiff correctly cites this holding as recognizing that federal

regulation of flight extends below 400 feet. It is, however, also appropriate to consider the

Court's explanation as to why local regulation of flight is inconsistent with the federal regulatory

scheme and simple common sense:

> It is ancient doctrine that at common law ownership of the land extended to the
> periphery of the universe -- Cujus est solum ejus est usque ad coelum. But that
> doctrine has no place in the modern world. **The air is a public highway, as
> Congress has declared.** Were that not true, every transcontinental flight would
> subject the operator to countless trespass suits. **Common sense revolts at the
> idea. To recognize such private claims to the airspace would clog these
> highways, seriously interfere with their control and development in the**

**public interest**, and transfer into private ownership that to which the only public has a just claim.

328 U.S. at 260-261 (emphasis added).

In 1948, the Supreme Court decided *Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp,* 333 U.S. 103 (1948) and again cited to both the unique nature of aviation and the comprehensive regulatory scheme established by Congress to explain exclusive federal control over aviation:

> Congress has set up a *comprehensive* scheme for regulation of common carriers by air. . . . We find no indication that the Congress either entertained or fostered the narrow concept that air-borne commerce is a mere outgrowth or overgrowth of surface-bound transport. . . . **[A]ir commerce, whether at home or abroad, soared into a different realm than any that had gone before.** Ancient doctrines of private ownership of the air as appurtenant to land titles had to be revised to make aviation practically serviceable to our society. **A way of travel which quickly escapes the bounds of local regulative competence called for a more penetrating, *uniform* and *exclusive* regulation by the nation** than had been thought appropriate for the more easily controlled commerce of the past.

333 U.S. at 105, 107 (emphasis added).

As aviation continued to develop, the Supreme Court and Congress never wavered with respect to the need for uniform and exclusively federal regulation. The principles, which were originally applied to federally regulate the navigable waters, were consistently applied to also regulate the navigable airspace.

## II.
## THE CURRENT REGULATORY REGIME
## FOR NAVIGABLE AIRSPACE
## IS PREDICATED UPON A UNIFORM AND EXCLUSIVELY
## FEDERAL SYSTEM.

The current structure for regulation of the navigable airspace has its roots in the Air Commerce Act of 1926, 44 Stat. 568, 49 U.S.C. § 171, et seq., and the Civil Aeronautics Act of 1938, 52 Stat. 973, 49 U.S.C. § 401, et seq. In both of those statutes as well as the currently applicable 1958 Act, Congress specifically declared that the United States has "complete and exclusive national sovereignty in the air space over this country." 49 U.S.C. 40103(a); *cf.* 49 U.S.C. § 176(a).

While that mandate remained unchanged, Congress passed the 1958 Act because it determined, in the wake of a series of high-profile air disasters, that there was a need to centralize federal control over aviation in the FAA. As was the case with respect to earlier federal aviation legislation, the legislative history of the 1958 Act evidences Congress' unequivocal intent to exclusively regulate aviation at the federal level—and its realization that a lack of sufficient control could have devastating results.

According to its legislative history, the purpose of the 1958 Act was to create one uniform system of air space management so as to "eliminate divided [federal] responsibility and conflicts of interest" and "avoid duplication of effort and a division of [federal] authority that could result in further confusion."[21] In a report accompanying the 1958 Act, Stuart Tipton, president of the Air Transport Association, explained, "*aviation is unique* among transportation industries in relation to the Federal Government—it is the only one whose operations are

---

[21] H.R. Rep. No. 85-2360 (1958), *reprinted in* 1958 U.S.C.C.A.N. 3741, 3744, 3747.

conducted *almost wholly* within the federal jurisdiction, and are subject to *little or no regulation by the States or local authorities.*"[22]

The foregoing Senate report further sets forth that transferring all safety and rulemaking to a single federal agency (*i.e.*, the FAA) was necessary because "aviation safety is essentially indivisible" and "experience indicates that the preparation, issuance, and revision of regulations governing matters of safety can best be carried on by the agency charged with the day to day control of traffic, the inspection of aircraft and service facilities, and certification of pilots and related duties."[23]   Congress concluded that the only means to effectuate such a uniform and exclusive system of regulation was to vest "full safety rule making authority" in one federal agency headed by an administrator with "plenary" (complete) authority to make and enforce safety regulations governing, among other things, the design and operation of civil aircraft.[24]

The Supreme Court first considered the scope of preemption intended by the 1958 Act in *City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624 (1973). The specific issue before the Court was whether the 1958 Act, as amended by the Noise Control Act of 1972, implicitly preempted a local ordinance that sought to control aircraft noise by regulating the time periods in which jet aircraft could take off from the Hollywood-Burbank Airport. The Supreme Court concluded that the local ordinance was preempted by federal law. 411 U.S. at 625, 626.  In so doing, it again cited to prior case law explaining federal control over navigation to explain its holding:

> The Court in *Cooley v. Board of Wardens*, 12 How. 299, 13 L.Ed. 996, first stated the rule of pre-emption which is the critical issue in the present case. Speaking through Mr. Justice Curtis, it said:

---

[22] S. Rep. No. 85-1811, at 5 (1958) (accompanying S. 3880, 85th Cong., 2d Sess.) (emphasis added).

[23] *Id.* at 11, 27.

[24] H.R. Rep. No. 85-2360.

'Now the power to regulate commerce, embraces a vast field, containing not only many, but exceedingly various subjects, quite unlike in their nature; some imperatively demanding a single uniform rule, operating equally on the commerce of the United States in every port; and some, like the subject now in question, as imperatively demanding that diversity, which alone can meet the local necessities of navigation.

'. . . Whatever subjects of this power are in their nature national, or admit only of one uniform system, or plan or regulation, may justly be said to be of such a nature as to require exclusive legislation by Congress.' Id., at 319.

*City of Burbank,* 411 U.S. at 625.

The Court noted that, although the control of noise is within the police power of the states, the "pervasive control" of aviation safety and flight operations at the federal level left "no room for local curfews or other local controls." 411 U.S. at 638. In other words, the holding in *Burbank* is that State or local governments which purport to use their police powers to regulate aircraft noise are precluded from doing so because this issue falls within a field that is exclusively regulated at the federal level, *i.e.*, aviation safety and flight operations.

The holding of *Burbank* is directly relevant to the issues raised in this case. Much as the City of Burbank did, Newton has enacted an ordinance through which it attempts to use its police powers to regulate aircraft navigation. *Burbank* holds that a local exercise of police power, which infringes on the federal government's control of flight, is contrary to what Congress intended and just as abhorrent as earlier attempts by local governments to regulate the navigable waters. These same principles also apply to the regulatory scheme applicable to the still developing technology regarding unmanned aircraft, including unmanned aircraft flights operated below 400 feet altitude.

**III.**
**FEDERAL CONTROL OF THE NAVIGABLE AIRSPACE**
**PREEMPTS ALL STATE AND LOCAL ATTEMPTS**
**TO REGULATE FLIGHT OPERATIONS, INCLUDING**
**THOSE CONDUCTED BELOW 400 FEET.**

Newton's ordinance does not just seek to punish those who use unmanned aircraft for some improper purpose such as voyeurism or the like. Rather, Newton's ordinance directly attempts to regulate aircraft flight and conditionally ban unmanned flight below 400 feet. Newton claims that its police powers under Massachusetts law allow it to do so. Holdings of the Supreme Court of the United States and the Massachusetts Supreme Judicial Court clearly refute this contention. Moreover, the principles set forth therein have been applied to hold another city's attempt to regulate low altitude unmanned flight to be unconstitutional.

The United States Supreme Court's holding in *Burbank, supra* clearly illustrates that as with the case at bar, a matter that would otherwise fall within a municipality's police powers will be preempted when it infringes on the federal government's regulatory authority over flight operations in the national airspace. As *Burbank* also illustrates, preemption of the exercise of this police power extends to local laws directed at airport takeoffs and landings, *i.e.* flight below 400 feet altitude. As *Burbank* explains, the 1958 Act "requires a delicate balance between safety and efficiency" and that the "interdependence of these factors requires a *uniform and exclusive* system of federal regulation if the congressional objectives underlying the [1958 Act] are to be fulfilled." 411 U.S. at 638- 639.

Two years prior to *Burbank*, the Massachusetts Supreme Judicial Court was requested to provide an advisory opinion to the Massachusetts Legislature addressing whether it could prohibit the Concorde from landing or taking off at Logan Airport. That opinion is relevant to the Newton ordinance because it pertains to a State's right to regulate the airspace below 400 feet

altitude.  In that regard, the Massachusetts Supreme Judicial Court advised the Massachusetts

legislature that the proposed statute would likely be preempted.

> **The Federal government has asserted a broad authority to control and regulate the use of navigable airspace and aircraft operations.** The principal statute in the present comprehensive scheme of Federal control is the Federal Aviation Act of 1958, 49 U.S.C. ss 1301-1542 (1964), as amended. Under this act, the United States is declared 'to possess and exercise complete and exclusive national sovereignty in the airspace of the United States.' 49 U.S.C. s 1508(a) (1964), and ss 1655(c), 1657(f) (Supp. V, 1965-1969). Each citizen of the United States is granted the 'right of freedom of transit through the navigable airspace of the United States.' See 49 U.S.C. s 1304 (1964), and ss 1655(c), 1657(f) (Supp. V, 1965-1969). 'Navigable airspace' is defined as all airspace 'above the minimum altitudes of flight prescribed by regulations issued under this chapter, and shall include airspace needed to insure safety in take-off and landing of aircraft.' See 49 U.S.C. s 1301(24) (1964), and ss 1655(c), 1657(f) (Supp. V, 1965-1969). The act established the Federal Aviation Agency, headed by an administrator (later transferred to the Secretary of Transportation, 49 U.S.C. ss 1655(c), 1657(f) (Supp. V, 1965-1969)), and conferred upon that agency broad powers to regulate air commerce in the public interest. See 49 U.S.C. ss 1303, 1341(a), 1348 (1964), and ss 1655(c), 1657(f) (Supp. V, 1965-1969). **The act confers upon the administrator vast powers over all aspects of aircraft navigation. These powers include, among other things, authority for the development of plans and policy with respect to the use of navigable airspace and allotment of the use of such airspace.** See 49 U.S.C. s 1348(a) (1964), and s 1655(c) (Supp. V, 1965-1969). The administrator also has general authority to issue such orders, rules and regulations as he deems necessary to carry out the provisions of the act. See 49 U.S.C. s 1354 (1964), and ss 1655(c), 1657(f) (Supp. V, 1965-1969).

*Opinion of the Justices*, 359 Mass. 778, 780–81, 271 N.E.2d 354, 356–57 (1971)(emphasis

added).

On account of the foregoing, the Massachusetts Supreme Judicial Court concluded that

there was a broad "preexisting" scheme of federal control of aircraft flight regulation, which

preempted local governments from exercising their police powers to control aircraft noise by

planes "landing or taking off in the commonwealth."   359 Mass. at 784, 778. That holding

refutes the position which Newton espouses in support of its ordinance. While takeoffs and

landings at Logan clearly occur below 400 feet altitude, the regulation was preempted because

federal law confers upon the FAA "vast powers over all aspects of aircraft navigation" including, "authority for the development of plans and policy with respect to the use of navigable airspace and allotment of the use of such airspace." *Id.*

Newton ignores the foregoing as well as a First Circuit finding that a State's exercise of its police powers relevant to pilot drug testing were preempted by federal control over flight operations because "a patchwork of state laws . . . would create a crazyquilt effect." *French v. Pan Am Exp., Inc.*, 869 F.2d 1, 6 (1st Cir. 1989). The decision therefore preempts an otherwise valid exercise of police powers "below 400 feet." However, the decision also is relevant here because it was cited by the FAA in the guidance materials (from which Newton's attorneys only selectively quote in their cross-motion).

The FAA's guidance to State and local governments specifically cites to *French* in explaining that "a *'patchwork quilt'* of differing restrictions could severely limit the flexibility of FAA in controlling the airspace and flight patterns, and ensuring safety and an efficient air traffic flow."[25] That statement echoes the Massachusetts Supreme Judicial Court's opinion recognizing the FAA's "vast powers over all aspects of aircraft navigation" including, "authority for the development of plans and policy with respect to the use of navigable airspace and allotment of the use of such airspace."

It is important to emphasize that the FAA's "vast powers over all aspects of aircraft navigation" did not arise from the noise legislation which the *Burbank* Court addressed. Rather, as *Burbank* also noted, those powers pre-existed that legislation. *Burbank* specifically stated that Congress recognized that preemption of noise **merely expands the Federal Government's**

---

[25] *See* Newton Exhibit 14, p.2 ("*State and Local Regulation of Unmanned Aircraft Systems*") FAA Office of the Chief Counsel; *see also,* https://www.faa.gov/uas/resources/uas_regulations_policy/media/uas_fact_sheet_final.pdf (last visited on May 17, 2017).

**role in a field already preempted. \* \* \* State and local governments will remain unable to use their police powers to control aircraft noise by regulating the flight of aircraft'** (emphasis supplied). *Burbank*, 411 U.S.at 635 (internal citations omitted).

In accordance with the foregoing, *American Airlines, Inc. v. Hempstead*, 398 F.2d 369 (2d Cir. 1968), a case cited by both *Burbank* and *Opinion of the Justices*,[26] held that a town ordinance aimed at aircraft noise was preempted because it infringed on federal control of flight patterns and the navigable airspace. *Id.* Regulation of the flight of aircraft, which *Hempstead*, like *Burbank*, held to be invalid, is the same field that Newton's ordinance directly infringes upon. *Hempstead*, like *Burbank*, holds such regulation to be invalid. Both of those cases and the reasoning set forth therein were subsequently cited by another New York court in 1999 as the basis for invalidating a New York City law which, like Newton's ordinance in the case at bar, also attempted to regulate unmanned flight below 400 feet altitude.

*People v. Santoriello*, 183 Misc. 2d 54702 N.Y.S.2d 539 (Crim. Ct. 1999) did not deal with drone technology. Instead, it dealt with unmanned parasail advertising banners that were towed by boats using the same navigable waters that were the subject of the Supreme Court's decision in *Gibbons v Ogden*. At issue in *Santoriello* was a NYC ordinance prohibiting unmanned parasail advertising banners from being towed in the Hudson River. The court cited to both *Hempstead* and *Burbank* in holding that the ordinance was an invalid exercise of local police power because it attempted to regulate the use of the nation's navigable airspace.

The rationale for the *Santoriello* holding precluding New York City from regulating low altitude unmanned flight is directly relevant to the case at bar. A similar holding in this case is

---

[26] *Burbank,* 411 U.S. at 628, and the Massachusetts Supreme Judicial Court in *Opinion of the Justices*, 359 Mass. at 782, 783.

further supported by Congress' subsequent enactment of legislation specifically directed at the unmanned aircraft technology, which the Newton ordinance now attempts to directly regulate.

## IV.
## CONSISTENT WITH ITS LONGSTANDING MANDATE TO SAFELY AND EFFICIENTLY DEVELOP THE NATIONAL AIRSPACE, CONGRESS HAS CONFIRMED THAT THE FAA'S JURISDICTION ALSO EXTENDS TO UNMANNED AIRCRAFT

Just as Congress has required the FAA to integrate jet flight, balloons,[27] gliders[28] and various other forms of aircraft into the national airspace, Congress has specifically directed the FAA to integrate unmanned aircraft into this exclusively federal regulatory structure.

The Congressional mandate to the FAA in the 1958 Act regarding the development of the national airspace , which the Massachusetts Supreme Judicial Court refers to in its 1971 *Opinion of the Justices,* remains in effect today. Although the applicable section of the law has been re-codified, 49 U.S.C. § 40103 still sets forth that ongoing mandate. It provides as follows:

**(b) Use of airspace**

> **(1)** The Administrator of the Federal Aviation Administration shall develop plans and policy for the use of the navigable airspace and assign by regulation or order the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace. The Administrator may modify or revoke an assignment when required in the public interest.

> **(2)** The Administrator shall prescribe air traffic regulations on the flight of aircraft (including regulations on safe altitudes) for--

> > **(A)** navigating, protecting, and identifying aircraft;

---

[27] *See* 14 CFR parts 31, 43 and 91; *see also,* https://www.faa.gov/aircraft/air_cert/design_approvals/balloons/balloons_regs/ (last visited on May 30, 2017).
[28] *See* FAA's Glider Flying Handbook, available at https://www.faa.gov/regulations_policies/handbooks_manuals/aircraft/glider_handbook/ (last visited on May 30, 2017).

**(B)**   protecting individuals and property on the ground;

**(C)**   using the navigable airspace efficiently; and

**(D)**   preventing collision between aircraft, between aircraft and land or water vehicles, and between aircraft and airborne objects.

As the Massachusetts Supreme Judical Court recognized almost fifty years ago, this Congressional mandate requires the FAA to broadly regulate the airspace of this nation. That mandate clearly included regulation that would extend to the surface of the earth. Congress specifically requires the FAA to "protect individuals and property **on the ground**" as well as "prevent collisions between aircraft and **land or water vehicles**."

In conjunction with the foregoing, in 2012, Congress passed the FAA Modernization and Reform Act (2012 FMRA),[29] which leaves no doubt that the FAA's broad authority over the national airspace also extends to unmanned aircraft. The 2012 FMRA charged the FAA with "[developing] a comprehensive plan to safely accelerate the integration of civil unmanned aircraft systems into the national airspace system."[30]   This Congressional directive to the FAA clearly falls within the FAA's pre-existing regulatory authority and is wholly consistent with the manner in which Congress has continued to integrate all flight operations into the regulatory structure which it established almost 100 years ago.

Just as steamships were recognized to require the same regulatory structure that applied to sailing vessels, Congress has steadfastly applied the same principles to the various types of aircraft that now use the navigable airspace.   By defining unmanned aircraft systems[31] as "aircraft" and directing the FAA to integrate same into the navigable airspace, Congress clearly

---

[29] PL 112-95; codified at 49 USC §40101, note.
[30] *See* section 332 of the 2012 Modernization Act entitled, "INTEGRATION OF CIVIL UNMANNED AIRCRAFT SYSTEMS INTO NATIONAL AIRSPACE SYSTEM."
[31] *See* §§331(8) and (9) of 2012 FMRA.

expressed its intention to regulate this latest technological development consistent with the manner in which other forms of aircraft have been regulated, *i.e.* at the federal level. Tellingly, Congress made no mention of any intent to alter the longstanding and exclusively federal nature of this regulatory construct insofar as unmanned aircraft are concerned.

Consistent with the foregoing, Congress has more recently passed the FAA Extension, Safety, and Security Act of 2016, which aimed to expedite approval for UAS deployment in emergencies, prohibit UAS from interfering with emergency response activities, and prevent unauthorized UAS operation around airports and critical infrastructure. Consistent with its mandate from Congress to regulate air safety generally, and integrate unmanned aircraft into the national airspace, the FAA also released in December, 2015, the Fact Sheet which Newton's attorneys selectively quote from and attach as Exhibit 14 to their cross motion. As previously noted herein, this guidance from the FAA does not authorize Newton or any other State or local government to regulate unmanned aircraft.   Rather, the FAA reminds State and local jurisdictions that they lack authority to regulate airspace and flight operations. In this regard, the FAA Fact Sheet states that "[s]ubstantial air safety issues are raised when state and local governments attempt to regulate the operation or flight of aircraft" and "[a] navigable airspace free from inconsistent state and local restrictions is essential to the maintenance of a safe and sound air transportation system."[32]

Insofar as the scope of federal preemption is concerned, the FAA's guidance materials indicate that the FAA does not consider State or local government laws addressing the following to be preempted:

- Requirement for police to obtain a warrant prior to using a UAS for surveillance.
- Specifying that UAS may not be used for voyeurism.

---

[32] *See* Newton Exhibit 14, p.2.

- Prohibitions on using UAS for hunting or fishing, or to interfere with or harass an individual who is hunting or fishing.Prohibitions on attaching firearms or similar weapons to UAS.[33]

None of this guidance suggests that a city may implement its own UAS operational flight restrictions, limitations, or requirements.  Relevant to what is preempted, the Court should be aware that the FAA also has taken the following steps to ensure public safety and integrate unmanned aircraft into the national airspace:

- Revised its procedures for authorizing small UAS ("sUAS") pursuant to an exemption process and created a blanket Certificate of Waiver or Authorization ("COA") for sUAS flights at or below certain altitudes.
- Promulgated new sUAS rules on June 21, 2016, permitting the flight of sUAS at altitudes below 400 feet, subject to various restrictions: requiring VLOS operations; banning UAS operations over anyone not involved with the operation; allowing UAS operations only within visual line of sight and requiring one operator per UAS.
- Established a new certification process for sUAS operators and UAS test administrators.
- Issued an Order (JO 7200.23) providing information and guidance on air traffic policies and establishing procedures relating to UAS operations.
- Established guidance for law enforcement regarding unauthorized UAS operations and initiated over 20 legal enforcement actions – independently and in cooperation with state and local law enforcement – related to such operations.
- Established a UAS Oversight and Compliance Focus Team, which provides a single point of contact for FAA field personnel on UAS oversight and compliance issues.
- Formed the Drone Advisory Committee ("DAC") to convene CEO/COO-level executives from a cross-section of stakeholders to discuss issues and challenges associated with UAS.
- Established the Aviation Rulemaking Committee to provide recommendations regarding the classification and regulation of "micro" UAS, and the UAS Registration Task Force to develop recommendations on UAS registration.
- Launched the UAS Detection Initiative and implemented a program in collaboration with industry members and federal agencies to evaluate technologies that can be used to detect and track UAS flying too close to airports, critical infrastructure, or other controlled airspace.
- Developed consumer education programs, such as "Know Before You Fly" and "No Drone Zone," to provide prospective users of unmanned aircraft with the information they need to safely and legally operate UAS. Several UAS manufacturers have voluntarily begun to include such FAA literature with their product packaging.
- Published more than 200 facility maps depict areas and altitudes near airports where UAS may operate safely once UAS operators have obtained FAA authorization.

---

[33] *See* Newton Exhibit 14, p.3.

The foregoing demonstrates the substantial actions which the FAA has taken and is continuing to take to fulfill its statutory mandate to safely integrate unmanned aircraft into the national airspace while also protecting persons and property on the ground and water. In accordance with recent Congressional directives, the FAA has continued to assert its jurisdiction over flight in the navigable airspace and begun to implement its rules and policies across all aspects of UAS operations. These activities together with the longstanding and exclusively federal regulatory structure in which they take place demonstrate that there is no room for a State or local government to assume a role that neither Congress nor the Supreme Court has ever recognized it to have.

## V.
### THE LONG HISTORY OF AN EXCLUSIVELY FEDERAL REGULATORY SCHEME COUPLED WITH THE ABSENCE OF ANY VALID STATE OR LOCAL REGULATION WARRANT A FINDING THAT THE NEWTON ORDINANCE IS PREEMPTED.

The case law and legal authorities cited herein and in the Plaintiff's motion papers provide overwhelming support for the conclusion that Newton's attempt to regulate unmanned aircraft flight requirements conflict with, and infringe upon, the exclusively federal regulatory scheme for aviation as well as Congress' mandate that the FAA integrate unmanned aircraft into the national airspace. Newton provides no contrary legal authority.

The conclusion that preemption applies is further strengthened by two additional factors. These are the longstanding and exclusively federal regulation of flight and the absence of any history of valid State or local regulation in this area. These additional factors preclude the use of a presumption *against* preemption and require Newton to establish that the use of its police powers to regulate flight would fall within the framework of the existing federal scheme. Newton does not and cannot make such a showing.

As this Court has recognized, until fairly recently, most preemption case law utilized an analysis which incorporated a presumption against preemption. In that regard, this Court's decision in *Ophir v. City of Boston*, 647 F. Supp. 2d 86 (D. Mass. 2009), correctly noted that the Supreme Court had long ago instructed that

> When addressing questions of express or implied pre-emption, we begin our analysis 'with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

647 F. Supp. 2d at 91.

This Court correctly recognized, however, that more recent Supreme Court case law had modified this earlier statement of the law. It cited to same and in so doing stated,

> the presumption [in favor of applying state law] is not triggered when a state regulates in an area "where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000) (refusing to apply presumption in favor of state laws bearing upon national and international maritime commerce).

647 F. Supp. 2d at 91-92. The Court then applied that rationale to resolve a dispute regarding automobile fuel economy standards.

In considering the foregoing, it is relevant to note that the holding in *Locke*, to which this Court cited, also made clear that in areas of the law where there has been a history of federal presence and an absence of any prior valid State or local regulation, courts should analyze the preemption issue by determining whether the State law is consistent with the federal scheme and the need for uniformity. In that regard, the Supreme Court stated in *Locke*:

> The state laws now in question bear upon national and international maritime commerce, and in this area there is no beginning assumption that concurrent regulation by the State is a valid exercise of its police powers. Rather, we must ask whether the local laws in question are consistent with the federal statutory structure, which has as one of its objectives a uniformity of regulation for maritime commerce.

26

529 U.S. at 108.

The rule set forth in *Locke* is applicable in the case at bar. As demonstrated herein, there is a long history of exclusive federal control of navigation that has repeatedly been held to invalidate any State or local attempt to regulate in this area. From its inception, aviation has been so regulated. As set forth herein, numerous State and federal courts have held that State and local governments cannot attempt to use their police powers to attempt to regulate flight, even when the exercise of those powers pertains to flight or related operations which take place below 400 feet. Consistent with these holdings, Congress has regulated extensively in this area and repeatedly noted the need for uniformity.

The foregoing renders the standard set forth in *Locke* applicable to the resolution of the case at bar. Rather than allowing it to simply argue that its ordinance is an exercise of its police powers and as such, entitled to a presumption of validity, *Locke* requires that Newton come forward and demonstrate that its ordinance fits within the federal regulatory structure and that the federal scheme allows for non-uniform State and local regulatory initiatives. Although the case law set forth herein and in Plaintiff's brief would overcome any presumption against preemption if that standard was applicable, it clearly is not and Newton must demonstrate both consistency with the federal scheme for regulating aircraft flight as well as the federal scheme for the development of the national airspace. Additionally, Newton also must show that non-uniform regulation in this area is consistent with federal objectives.

Newton cannot make any such showing (and does not even try). Its ordinance directly contradicts the FAA's guidance materials, regulates in an area that the courts repeatedly have held to be preempted from State and local control and attempts to establish a non-uniform system of regulation that would violate the principles that the Supreme Court and Congress have

repeatedly articulated. In that regard, if the Newton ordinance were allowed to stand, every city and town across the nation could follow suit, which would "clog the highways of the navigable airspace", a result that the Supreme Court held in *Causby* to be impermissible. It would also establish a '*patchwork quilt*' of differing restrictions that the First Circuit recognized in *French* could severely limit the flexibility of FAA in controlling the airspace and flight patterns, and ensuring safety and an efficient air traffic flow. In so doing, the Newton ordinance also would seriously interfere with the integration of unmanned aircraft into the national airspace, which Congress mandated the FAA to accomplish in 2012 FMRA.

There should be no doubt that the analysis required by *Locke* applies herein. Various Circuit Courts of Appeal, including the First Circuit, have recognized that the *Locke* standard applies to issues pertaining to the regulation of aviation. In that regard, the First Circuit was the first court after *Locke* to recognize that there is no presumption against preemption in the field of aviation. *See United Parcel Service, Inc. v. Florez-Garlaza*, 318 F.3d 323, 336 (1st Cir. 2003).

Seven years later in *US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1325 (10th Cir. 2010), the Tenth Circuit cited to Ninth Circuit's holding in *Montalvo v. Spirit Airlines*, 508 F.3d 464, 471 (9th Cir. 2007) (". . . the field of aviation safety "has long been dominated by federal interests") as well as to *Locke* to hold that there is no presumption against preemption regarding aviation. That holding also cites to the Supreme Court post-*Locke* decision in *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347-48 (2001), which explained that the presumption against preemption did not apply because the field at issue was "hardly a field which the States have traditionally occupied."

Neither manned nor unmanned aircraft flight operations nor the navigable airspace, have ever been regulated by State or local governments. *Burbank, Causby, French* and the

Massachusetts Supreme Judicial Court's decision in *Opinion of the Justices* all demonstrate that State and local governments attempting to exercise their police powers in these areas are precluded from doing so. Accordingly, there is no basis to presume that federal law does not similarly preempt the Newton ordinance now at issue. In light of same and the overwhelming body of case law cited herein, the Newton ordinance should be held to be preempted.

## CONCLUSION

The case law set forth herein demonstrates that the exclusively federal regulatory structure applicable to this nation's navigable waters and national airspace extends to new technologies. The spectrum of new technologies that have been subsumed into the existing federal scheme for exclusively controlling navigation runs from sailing vessels, to steamships, to propeller driven aircraft, to modern jets and supersonic aircraft. That spectrum has now been extended further to encompass unmanned aircraft.

Much like the Supreme Court that long ago held that steamships were subject to the same regulatory scheme as sailing vessels, the substantive case law and numerous mandates from Congress that are cited herein clearly require unmanned aircraft technology to be incorporated into the existing regulatory structure for aviation. Inconsistent and non-uniform regulation by innumerable cities and towns across this nation would be wholly contrary to that goal. Congress' longstanding objective to safely and efficiently develop the national airspace requires uniformity and also requires that local attempts at regulation be preempted.

A holding that recognizes the need for uniform federal regulation is not, however, something that any State or local government should fear. The federal regulatory scheme governing flight for almost one hundred years has required the FAA and the aviation industry to work together. The result has been an unparalleled safety record that also takes into account the

concerns and needs of local communities. The FAA and industry organizations like CTA and AUVSI are committed to working with State and local government officials to achieve the same results with respect to unmanned aircraft. However, this can only be accomplished if unmanned flight is regulated in the same centralized and consistent way that is the cornerstone of aviation governance in this country.

Dated: New York, New York
       June 1, 2017

/s/ Jeffrey J. Ellis

Jeffrey Ellis, Esq. (*Pro hac vice* pending)
Daniel Correll, Esq. (*Pro hac vice* pending)
Troy Shuman, Esq. (BBO # 693405)
Clyde & Co US LLP
The Chrysler Building
405 Lexington Avenue, 16th Floor
New York, NY 10174
Tel: 212-710-3900
Fax: 212-710-3950
E-mail: Jeff.Ellis@clydeco.us